In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-1345, 04-1508 & 04-1534

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MALCOLM C. GOUGIS, JEROME COLEMAN,
and ANTHONY BROWN,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 886—**Suzanne B. Conlon**, *Judge.*

ARGUED SEPTEMBER 14, 2005—DECIDED DECEMBER 27, 2005

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Anthony Brown, Jerome Coleman, and Malcolm Gougis were indicted with three other men on charges of conspiracy and attempt to possess cocaine with intent to distribute and theft of government property. At the time of the crimes, the defendants were current or former law enforcement officers and were targeted in a sting operation set up by the government with the help of a confidential informant. Gougis pleaded guilty to the charges against him; Brown and Coleman were found guilty by a jury.

Much of the evidence against the defendants consisted of recorded conversations between the informant and the coconspirators before, during, and after the crimes. On appeal, Brown and Coleman argue that the content of these taped conversations is ambiguous at best and insufficient to establish conspiracy or attempt to possess cocaine. Brown also attacks an evidentiary ruling by the district court allowing the admission of a portion of the audiotape in which Brown and the informant are heard discussing a gold watch Brown stole while executing a search warrant five years earlier. The district court viewed this prior theft evidence as "intricately related" to the conspiracy or otherwise admissible under FED. R. EVID. 404(b); Brown argues it was completely unrelated to the charged offenses and inadmissible as other acts evidence under Rule 404(b). Finally, all three defendants challenge their sentences under *United States v. Booker*, 125 S. Ct. 738 (2005).

We affirm the convictions. The evidence was sufficient to convict Brown and Coleman on the drug charges, and the taped conversation about Brown's prior theft was admissible as evidence "intricately related" to the charged conspiracy. The defendants forfeited their *Booker* claims, leaving only plain error review; we retain jurisdiction and order a limited remand under *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I. Background

This case involves overlapping FBI undercover operations conducted in Chicago in June 2003 against corrupt law enforcement officers. The government's informant, Jacques Polk, worked as a police officer at the Chicago Housing Authority ("CHA") and was caught in a sting operation robbing an FBI agent posing undercover as a drug dealer. Polk agreed to cooperate with the FBI in other undercover

operations. Under the agency's direction, Polk recruited Raymond Grady, a Cook County sheriff's deputy, who in turn recruited Coleman, who worked with Grady in the jail, to participate in thefts from drug dealers' cars. Polk also recruited Brown and Jesse Kuykendoll, a fourth accomplice, to participate in a separate but similar scheme. Brown and Kuykendoll previously worked with Polk as police officers at the CHA and at the time of the crimes were employed as parole officers for the State of Illinois.[1] We summarize here the trial evidence against Coleman and Brown—much of it, as we have noted, contained in recorded conversations between Polk and the various coconspirators.

## A. Jerome Coleman

On the evening of June 6, 2003, Polk, Grady, and Coleman had a three-way telephone conversation to discuss plans to steal from a drug dealer's car. Grady had already participated with Polk in two thefts from FBI undercover vehicles that Polk represented were drug dealers' cars. Earlier that day, Polk and Grady discussed recruiting others to participate in another such theft, and Grady mentioned Coleman. Grady told Polk that he and Coleman had worked together in the jail and sold contraband cigarettes and candy to inmates. Grady eventually reached Coleman and then contacted Polk to say Coleman was ready to participate.

During the three-way telephone conversation, Polk told Grady and Coleman that his "guy" had set up the theft for that night and that there would be drugs as well as cash in the dealer's car: "[M]y guy say there's gonna be some

---

[1] Gougis, a former Seattle police officer, and yet another accomplice, Marcus McFadden, were implicated with Grady in another aspect of the sting operation not at issue on this appeal. Gougis pleaded guilty and challenges only his sentence on appeal.

coke in there. So it'll probably be like, a, uh, a brick." Polk explained that the "coke" would go to his "guy" and the three of them would split the money.

Later that evening, Polk, Grady, and Coleman met to carry out the planned theft. Polk drove the three men to a movie theater parking lot where they found a red Chevrolet Caprice that had been parked there by FBI agents. Polk indicated to Coleman and Grady that this was the car his "guy" had described. Before parking the red Caprice in the movie theater lot, FBI agents had placed $12,000 under a mat in the trunk and a sham kilogram of cocaine in the spare tire well.

Grady broke into the Caprice while Coleman stood as a lookout, pretending to talk on his cell phone. Polk then searched the front seat of the car and popped the trunk while Coleman searched the back seat. Grady and Polk eventually found the money and sham cocaine in the trunk; Polk testified that the sham kilogram was packaged like cocaine he had seen on the street while working as a police officer. Polk transferred the money and the fake "kilo" to his car, placing both items under the driver's seat. The three men got back into Polk's car. As they drove off, Polk remarked to Coleman and Grady that he would give his "man" the "coke." They then split the money—$5,000 apiece for Polk and Grady and $2,000 for Coleman.

**B. Anthony Brown**

On June 19 Polk proposed another theft to Grady, and Grady suggested contacting Kuykendoll. Polk and Kuykendoll had worked together as CHA police officers, and Polk said he knew Kuykendoll was a "crook." On June 23 Grady told Polk he had spoken to Kuykendoll, now a state parole officer, and Kuykendoll remembered working with Polk at the CHA and agreed to participate in the scheme. Grady also reported that Kuykendoll had reminisced about

the nefarious activities he and Polk had been involved in at the CHA, saying, "Man, our days back in CHA, man we should of been indicted like a hundred, a hundred times over." Later that day, Polk called Kuykendoll, who was in a state car with Brown, another state parole officer who had previously worked with Polk as a CHA officer. Brown got on the phone and Polk asked him if he remembered a particular search they had done as CHA police officers. Brown and Polk laughed, but Brown reminded him, "it's a State phone," so the subject was dropped. Brown agreed to meet with Polk to discuss the theft scheme.

They met the next day, and Polk told Brown about the plan, saying it's "so ridiculous for us, man that's gonna put about at least, minimum five G's a piece." Polk explained that he knew a drug dealer who could set up a drug transaction they could "hit." The "hit" would involve a large amount of cocaine and cash in a parked car: "you know somebody got some work or something like two keys or whatever woo-woo." Polk testified at trial that "work" was a street term for narcotics and that by "two keys" he meant two kilograms of cocaine. Polk told Brown that his friend would tell him where the car was parked and also explained that he had another friend—Grady—who would break into the car. In Polk's words to Brown: "He call me and tell me where the car is, Grady get in the car, it's all she wrote. We split up the cash and my boy always gets the dope."

Polk told Brown the theft would be set up for Friday, when the target would be coming into Chicago "with about forty stacks. . . . It should be about forty-five, forty, forty-five stacks and shit. Grady'll get in the car, he gets in the car, we just grab the loot." Brown asked Polk if he was sure his friend was not working "with no feds and all that." Polk assured Brown that he had already pulled at least three or four other jobs with this friend. Brown's role would be to stand as a lookout during the theft, and Polk confirmed this by describing Brown's job as "security." Brown said he had

to work on Friday but laughed and said that being on duty during the proposed heist would be "even better security."

On Friday, June 27, 2003, Brown met Polk, Grady, and Kuykendoll; all four men got into Polk's car and drove to a parking lot where FBI agents had left a red Chevrolet Monte Carlo. Agents had placed a brown paper bag containing $20,000 and a sham kilogram of cocaine in the trunk of the Monte Carlo, behind the carpet paneling.[2] The agents also set up surveillance in the parking lot and videotaped the theft.

Polk parked his car next to the Monte Carlo. Grady broke into the Monte Carlo; Polk walked around to the driver's side, opened the door, and popped open the trunk. Brown and Kuykendoll then got out of Polk's car and stood near the trunk of the Monte Carlo. The videotape shows Brown looking into the trunk during part of the time he stood his "security" post near the back of the Monte Carlo. Polk or Kuykendoll pulled back the carpet paneling in the trunk, exposing the bag of cash and the sham cocaine package. Polk testified at trial that upon seeing these two items, both Kuykendoll and Brown asked, "[T]hat's it?" Polk confirmed that these were the items they wanted. Brown then opened the rear driver's side door of Polk's car, and Polk placed the sham cocaine package under the driver's seat. Kuykendoll placed the bag of cash under Polk's driver's seat as well.

The four men then got back into Polk's car and left the scene. As they drove away, Polk recalled a time five years earlier when he, Brown, and Kuykendoll had stolen

---

[2] FBI Agent Lyle Evans testified at trial that he had participated in numerous drug arrests during his law enforcement career and that the packaging of the sham kilograms of cocaine was "consistent with what you might see in the way a kilogram is packaged," though on cross-examination he agreed that there are many different ways a kilogram of cocaine can be packaged.

items from a home where they were executing a search warrant while working as CHA police officers. Polk suggested that Brown made off "like he owned a jewelry store." Brown corrected Polk and said he had taken a gold nugget watch. He said he still had the watch, but wished he had pawned it.

Polk also joked with Grady about being greedy. "Next you're gonna be like man, can I, can I just take a piece of the kilo[?] Can I taste[?]" Polk said. Brown chimed in: "Can I get some for myself[?]" Polk then reminded them that his friend would get the drugs: "You know my man gets the coke." The four men split the money evenly, $5,000 each.

## C. Motion in limine

The government moved in limine to admit the portion of the taped, posttheft conversation in which Polk and Brown are heard discussing Brown's theft of a gold watch while executing a search warrant as a CHA police officer. The district court held that the prior theft evidence was admissible under the "intricately related" doctrine:

> [This] conversation[ ] may be admitted to establish that the charged conspiracy existed by showing how the conspiratorial relationship between the coconspirators developed, how the conspirators came to know each other, how they established a relationship of trust through their association, and how these events flowered into the charged conspiracy. As a result, [this] conversation[ ] may provide the jury with a complete picture of the evolution of the alleged conspiracy from the trust developed during the defendants' former exploits. I find the probative value of this evidence outweighs any prejudicial effect by showing defendants' knowledge of and participation in the conspiracy.

In the alternative, the district court held that the conversation about the prior theft was admissible as other acts evidence under FED. R. EVID. 404(b) on the issues of intent and absence of mistake.

Brown and Coleman were convicted following a jury trial on the three charges against them: conspiracy and attempt to possess more than 500 grams of cocaine and theft of government property. Brown filed a timely motion for a new trial under FED. R. CRIM. P. 33 and for acquittal on the two drug counts under FED. R. CRIM. P. 29. Brown's Rule 33 motion for a new trial challenged the district court's decision to admit the evidence relating to the watch theft and also argued the government had not presented sufficient evidence to support the drug convictions.[3] His Rule 29 motion challenged the sufficiency of the evidence to convict him of the two drug counts. The district court denied both motions, and Brown appealed. Coleman also moved for a new trial. The district court denied the motion by means of a minute order, and Coleman appealed.

## II. Discussion

### A.  Admissibility of prior theft evidence; "intricately related" doctrine

Brown argues that the district court abused its discretion by admitting the taped conversation about his prior theft of a watch while conducting a search as a CHA police officer. We review a trial court's evidentiary rulings for abuse of discretion and will order a new trial only if we discover error that had a "substantial and injurious effect or influence on the determination of a jury and the result is

---

[3] Brown's Rule 33 motion raised additional arguments that he has abandoned on appeal.

inconsistent with substantial justice." *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005) (citations omitted).

The district court admitted this evidence as "intricately related" to the charged conspiracy and also as permissible other acts evidence under Rule 404(b) on the issues of intent and absence of mistake. We find the first of these grounds sufficient to sustain the court's evidentiary ruling and need not address the second.

Under the "intricately related" doctrine, evidence of uncharged criminal activity like that at issue here may be admitted "if that evidence is 'intricately related to the facts of the case' before the court." *United States v. Ramirez*, 45 F.3d 1096, 1102 (7th Cir. 1995) (quoting *United States v. Hargrove*, 929 F.2d 316, 320 (7th Cir. 1991)). Whether instances of uncharged conduct are "intricately related" to the case at hand depends on whether "they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime." *United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2002); *see also United States v. Spaeni,* 60 F.3d 313, 316 (7th Cir. 1995). The intricately related doctrine essentially recognizes that evidence of other acts that relate to the chronological unfolding of events or otherwise explain the circumstances surrounding the charged crime is not offered to show propensity and therefore does not implicate the character/propensity prohibition of Rule 404(b). *Ramirez*, 45 F.3d at 1102 (citing cases).

The district court viewed the taped conversation about Brown's prior watch theft as intricately related to the charged crimes because it tended to explain Brown's participation in the conspiracy and his relationship

with two of his three coconspirators. We see no abuse of discretion in this determination. The coconspirators' cavalier discussion of Brown's prior theft—committed while he, Polk, and Kuykendoll were working together as CHA police officers—demonstrated a longstanding relationship of trust based in part upon previous participation in misconduct in public office. As the district court observed, this evidence helped explain how the relationship among the coconspirators evolved and became conspiratorial. *See Spaeni*, 60 F.3d at 316 (evidence of how a conspiratorial relationship began and developed, including evidence of defendant's uncharged criminal activities predating the period covered by the indictment was properly admitted under intricately related doctrine).

Brown contends that his prior watch theft was too tenuously connected to the present charges to be considered "intricately related," noting that stealing a watch is different than entering into a conspiracy or attempting to possess drugs.[4] That the current conspiracy was broader than its members' previous on-the-job exploits does not diminish the

---

[4] Brown asks us to ignore the similarity between the prior watch theft and the charge of theft of government property because he did not "fully contest" the theft charge at trial. This argument is a nonstarter. It is axiomatic that by pleading not guilty to the charge of theft of government property, Brown put the government to its burden of proving all the essential elements of that crime beyond a reasonable doubt. *See, e.g.*, *United States v. Whitlow,* 381 F.3d 679, 686 (7th Cir. 2004). The fact that Brown's defense at trial focused primarily on the two drug counts makes no difference. *See United States v. Brown,* 34 F.3d 569, 573 (7th Cir. 1994) ("[E]ven if a stipulation is offered[,] the prosecution has to be allowed to prove its entire case."). In any event, we have concluded that the district court did not abuse its discretion in admitting the watch theft evidence as intricately related to the drug conspiracy, despite any dissimilarity between the prior theft and the object of the conspiracy.

explanatory value of the prior theft evidence. Uncharged criminal activity need not be *identical* to the charged crime in order to be admitted under the intricately related doctrine. *United States v. Bogan,* 267 F.3d 614, 622 (7th Cir. 2001). Brown was recruited as a potential coconspirator at least in part because of his previous participation with Polk and Kuykendoll in an on-duty theft of property while a member of the CHA police force. Although the object of the present conspiracy was drugs and money, the watch theft evidence helped explain the nature of the coconspirators' previous relationship and Brown's readiness to participate in the conspiracy with Polk.

Brown also argues that the prior theft evidence was unduly prejudicial and therefore inadmissible under Rule 403. Evidence that is admissible under the intricately related doctrine is subject to exclusion if its probative value is substantially outweighed by the danger of unfair prejudice. *Ramirez,* 45 F.3d at 1103; FED. R. EVID. 403. Brown contends that the prior theft evidence was unnecessary and unhelpful in establishing his guilt on the two drug counts and was therefore "inherently prejudicial." For reasons already explained, however, the watch theft evidence *was* helpful in establishing Brown's participation in the conspiracy. It was indeed prejudicial to Brown's defense, but "[t]he vast majority of the government's evidence against a defendant is prejudicial to him. That's the idea." *United States v. Rutledge*, 40 F.3d 879, 885 (7th Cir. 1994). To warrant exclusion under Rule 403, "its probative value must be insignificant compared to its inflammatory nature so that the evidence *unfairly* prejudices the defendant." *Id.* (emphasis added). Not so here. The prior theft evidence was significant to an understanding of the nature of the coconspirators' preexisting relationship and helped explain Brown's participation in the present conspiracy with Polk and Kuykendoll. The evidence, while damaging, was not more inflammatory than probative, and its admission was not an abuse of discretion.

**B. Sufficiency of the evidence as to Brown**

Brown contends the evidence was insufficient to support the jury's guilty verdict on the charges of conspiracy and attempt to possess more than 500 grams of cocaine with intent to distribute. A defendant who challenges the sufficiency of the evidence "'faces a nearly insurmountable hurdle . . . [in that] we consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997) (internal quotation marks and citations omitted)).

Brown was convicted under 21 U.S.C. § 846 of conspiracy and attempt to violate 21 U.S.C. § 841, possession of a controlled substance[5] with intent to distribute. A conspiracy is "'a combination or confederation between two or more persons formed for the purpose of committing a criminal act through their joint efforts.'" *United States v. South*, 28 F.3d 619, 627 (7th Cir. 1994) (quoting *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir. 1990) (quotations omitted) (citations omitted)). To prove that Brown was guilty of the charged conspiracy, the government was required to prove both that he "knew of the conspiracy and that he intended to join it." *Id.* (citing *United States v. Hubbard*, 22 F.3d 1410, 1414-15 (7th Cir. 1994)).

Brown argues the evidence is insufficient to prove that he joined a conspiracy or attempted to possess a controlled substance because there is no evidence that he knew there would be cocaine in the car that was the target of the

---

[5] Cocaine is a "Schedule II" controlled substance. 21 U.S.C. § 812 (a)(4).

coconspirators' theft scheme. We disagree. The June 24 conversation between Polk and Brown describes a plan to steal contraband from a car that was to be used in a transaction involving a large amount of cocaine and a significant sum of money. Although phrased in the shorthand of street vernacular, Polk's proposal refers to a drug-dealer friend who would arrange a transaction involving some "work" (meaning narcotics, Polk explained at trial) along the lines of "two keys" (meaning two kilograms of cocaine), and also refers to a man with forty or forty-five "stacks" ($40,000-$45,000). Polk told Brown that his friend would let him know where the car with the "loot" was parked, Grady would break into the car, and they would steal its contents: "Grady'll get in the car, he gets in the car, we just grab the loot." Significantly, Polk also told Brown that "we split up the cash and my boy always get the dope."

Brown attempts to discount Polk's mention of his "boy" getting the "dope" in two ways. First, he says that because he did not specifically acknowledge Polk's mention of the "dope," the jury could not have found beyond a reasonable doubt that he even heard or understood the comment. Second, he argues that Polk's scenario precluded the very possibility of the presence of drugs in the car. He reasons that because Polk described his friend as a drug *dealer,* the plan envisioned stealing from an out-of-town drug *buyer*—that is, stealing cash, not drugs.

Brown's interpretation of the record essentially asks us to view the evidence in the light most favorable to *him* instead of viewing it in the light most favorable to the government. *See Jackson*, 177 F.3d at 631. The record as a whole supports the conclusion that Brown understood the plan would include taking some "dope" from the car along with cash and that Polk then would distribute the "dope" to his "boy" and the coconspirators would split the cash. Although Polk's set-up story was coded and somewhat cryptic, it

certainly did not *preclude* the presence of drugs in the car, as Brown contends. Brown's failure to acknowledge Polk's reference to "dope" does not compel a conclusion that he did not hear or understand the remark. The jury could reasonably infer from the references to "two keys" and delivering the "dope" to Polk's "boy" that Brown knew stealing cocaine was part of the plan. Brown's experience as a law enforcement officer and his familiarity with Polk also support the conclusion that he understood the terminology and the object of the plan.

Furthermore, the videotape of the theft depicts Brown standing near the open trunk of the car and at times looking directly into the trunk where the cash and sham kilo were found. He is also seen opening the door of Polk's car for Polk to transfer the cocaine package and Kuykendoll to transfer the cash. Polk testified that Brown saw both items in the trunk and that Brown watched as he transferred the fake drugs to his car. Agent Evans and Polk both testified that the sham cocaine package looked like what a kilogram "brick" of cocaine might look like on the street. Finally, after the theft Polk joked about Grady being so greedy he would ask to have a piece of the "kilo." Instead of expressing any surprise that the theft had netted a kilogram of cocaine as well as cash, Brown joined in the joking, asking, "Can I get some for myself?"

Finally, Brown argues that the evidence was insufficient to convict him on the drug counts because he and Polk never specifically discussed any particular drug type or quantity, much less 500 or more grams of cocaine. But Brown need not have known the specific drug type or quantity to be found guilty of conspiring or attempting to violate § 841. *See United States v. Martinez*, 301 F.3d 860, 865 (7th Cir. 2002) ("[D]rug type and quantity are not elements of the offense. . . . Accordingly, a defendant may be convicted under § 841(a)(1) even if he does not know the type or quantity of the controlled substance."). The jury's

determination of drug type and quantity was important to the sentence, but Brown's only sentencing issue on appeal is a plain error argument under *Booker* and *Paladino,* which we will address in a moment. In any event, the jury's verdict on drug type and quantity has sufficient evidentiary support: Polk and Brown discussed "two keys," meaning two kilograms of cocaine, and forty or forty-five "stacks," meaning $40,000-$45,000, an amount of money consistent with a drug transaction involving more than 500 grams of cocaine.

## C.  Sufficiency of the evidence as to Coleman

Coleman also challenges the sufficiency of the evidence to convict him of conspiracy and attempt to possess cocaine with intent to distribute. The government argues as a threshold matter that Coleman has not properly raised this issue because he never filed a Rule 29 motion challenging the sufficiency of the evidence and because his opening appellate brief did not mention the attempted possession charge. But Coleman *did* file a motion for a new trial in which he said the government failed to prove both the conspiracy and attempted possession charges; the fact that he did not specifically cite FED. R. CRIM. P. 29 in his motion makes no difference. *See South*, 28 F.3d at 627 (defendant's motion need only put the government on notice that he is challenging the sufficiency of the evidence to support the convictions). Coleman's motion provided adequate notice of his sufficiency of the evidence challenge. The government's second argument—that Coleman did not mention the attempted possession count in his opening appellate brief—is simply mistaken. Coleman's brief plainly states: "the government failed to convict Defendant Jerome Coleman of conspiracy to possess with intent to distribute *or attempted possession of cocaine with intent to distribute.*" (Emphasis added.) We proceed to the merits of Coleman's appeal.

Coleman's lone argument is that the government failed to prove beyond a reasonable doubt that he knew there would be illegal drugs present during the June 6, 2003 theft. But the pretheft conversation between Polk, Grady, and Coleman—even more so than the pretheft conversation between Polk and Brown—sufficiently established Coleman's knowledge that the proposed scheme involved drugs as well as money. During that conversation, a few hours before the theft, Polk specifically told Grady and Coleman there would be cocaine in the target car: "[M]y guy say there's gonna be some coke in there. So it'll probably be like, a, uh, a brick." Polk said the "coke" would go to his "guy" and the three of them would split up the money.

Polk and Agent Evans testified that the sham cocaine in the June 6 theft—like that in the June 27 theft—resembled a typical kilogram package of cocaine. After stealing the money and fake drugs, Polk told Coleman and Grady that he would give his "man" the "coke." This evidence amply supports the jury's verdicts on the two drug-related counts against Coleman.

### D. *Paladino* remands

The district court applied the Sentencing Guidelines as mandatory, in violation of the remedial rule of *Booker*. None of the defendants objected in the district court, so our review is for plain error. *See e.g.*, *United States v. Caldwell*, 423 F.3d 754, 762 (7th Cir. 2005). The government concedes, and we agree, that a limited remand pursuant to *Paladino* is appropriate so the district judge may indicate whether she would impose different sentences now that the Guidelines are advisory. *Paladino*, 401 F.3d at 483-85.

For the foregoing reasons, we AFFIRM Brown's and Coleman's convictions. We order a LIMITED REMAND pursuant to *Paladino* as to all three defendants' sentences.

A true Copy:

     Teste:

                _____

                *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*