NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued June 10, 2008
Decided August 13, 2008

**Before**

RICHARD A. POSNER, *Circuit Judge*

JOHN L. COFFEY, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

No. 07-2532

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　v.

RICHARD A. ROMANDINE,
　　　*Defendant-Appellant.*

Appeal from the United States District
Court for the Southern District of
Indiana, Terre Haute Division.

No. 2:06CR00003-001

Larry J. McKinney,
*Judge.*

**O R D E R**

During Richard Romandine's jury trial for the arson of the restaurant he operated with his son, *see* 18 U.S.C. § 844(I), the government introduced evidence that he had used a variety of drugs with three of his former employees.  The government argued that this evidence established Romandine's close relationship with those employees, who testified that

Romandine had discussed setting fire to his restaurant before or after it happened. Romandine argues on appeal, as he did at trial, that the evidence was in fact used to show his propensity to commit crime, in violation of Federal Rule of Evidence 404(b), and that it was unduly prejudicial under Federal Rule of Evidence 403. Upon review of the record we conclude that while the challenged evidence should have been excluded, the error was harmless. Accordingly, we affirm Romandine's conviction.

## I. Background

Rick's Steakhouse, a restaurant in Cloverdale, Indiana, was severely damaged by a fire that began on the night of Sunday, November 13, 2005. At the time, the owners of the business, Romandine and his son, Ryan, were struggling with debts to food distributors, the electric company, and the owner of the building. They also owed money for the restaurant's bakery equipment, and Romandine had missed his monthly mortgage payment for his house. Because Romandine had filed for bankruptcy three years earlier and received a discharge, another Chapter 7 bankruptcy filing would not have been an option for years. *See* 11 U.S.C. § 727(a)(8). Romandine and Ryan's most-recent check for rent and their share of the building's natural-gas bill had bounced, and the landlord had threatened to shut down the restaurant. Their joint checking account (which they also shared with Romandine's wife, Misha) was overdrawn by $310, and in the preceding months the account had incurred $3,025 in fees, mostly because of bounced checks.

Despite their dire financial straits, Romandine and Ryan were current in their monthly insurance payments, which were automatically deducted from their checking account. Although they made sporadic deposits to that account throughout each month, Romandine and his son always deposited enough cash to cover the insurance payment a day before the electronic transfer to the insurance company. And after purchasing the restaurant's equipment and furniture for about $22,000, Romandine and Ryan had continued the previous owner's coverage limits of $100,000 for the contents of the restaurant and $40,000 for business interruption. The policy was in Ryan's name, and any checks would be paid out to him. However, Romandine dealt with the insurance company, and it was he, not Ryan, who promptly called their insurance agent on the night of the fire and met with him the next day. In the end, the insurance company paid out a total of $7,500; Ryan used the proceeds to cover the restaurant's payroll and to pay his cellphone and car bills.

Investigators quickly agreed that the fire was intentionally set, though they offered competing theories about the means of ignition. Michael Vergon, a certified fire investigator and special agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives, concluded that the fire was started with an open flame in a small utility room used to store paper items. In contrast, a private fire-origin investigator hired by the insurance company concluded that the

fire was set using gasoline or another accelerant poured on the dining-room floor. Romandine, meanwhile, told Agent Vergon on the morning after the fire that, although there had been no electrical problems in the building since June, he suspected that the fire was caused by an electrical malfunction. He also mentioned that there had been lamp oil in the break room. But Robert Miller, an electrical engineer hired by the insurance company, ruled out an electrical cause. And Vergon did not find evidence of lamp oil in the break room or anywhere else. Nor did he find signs of a forced entry.

Agent Vergon could not pinpoint when the fire started. Sloia Shah, the operator of the gas station next door to the restaurant, said that his wife had smelled smoke when they arrived at the gas station that night between 11:17 PM and 11:22 PM. Fifteen minutes later Shah also smelled smoke, and when he went outside to investigate, he saw smoke rising from the restaurant. He reached the 911 operator at 11:37 PM.

Romandine and Ryan were questioned by Agent Vergon after the fire. Romandine said he did not go to the restaurant that night; he told Vergon that he believed Ryan was there until about 10:00 PM and was the last person to leave. Ryan confirmed that he left at 10 o'clock, adding that employee Mark Dunn and Ryan's friend Zach Schuee also had been there that evening. Ryan said that he locked all of the doors and chained the front entrance, and that Schuee drove him home (a 15-minute ride). He explained that he was on probation for possessing marijuana and was wearing a monitoring bracelet that would have triggered an alarm if he did not make it home by his 10:30 PM curfew. When Ryan arrived at home, he did not see his parents but assumed they were in their bedroom. He told Vergon that he went into the living room and talked to his girlfriend on his cellphone until a call came on the house line concerning the fire. That call came at 11:47 PM, and Romandine was home and took the call.

Agent Vergon suspected that Romandine had started the fire, and a later conversation with Mark Dunn fueled that suspicion. Although in their first interview Dunn had told Vergon only that he left the restaurant around 9:00 PM and that business had been slow that night, he offered much more detail during his second interview. Dunn said that he was at home after work when Romandine telephoned and asked if he wanted to smoke a joint. Dunn agreed, and Romandine arrived at his home shortly before 11:00 PM Dunn's cellphone records confirm that he received a call from Romandine's cellphone at 10:37 PM; those records also show another call from Romandine at 10:48 PM, which Dunn did not remember. According to Dunn, the two drove in Romandine's green Cadillac to the restaurant, which was about four or five minutes from Dunn's house. They spent about 30 minutes there and smoked marijuana in the office. Afterward, Dunn took two pieces of cake for the road. Romandine let him into the car, went back into the restaurant, and returned by the time Dunn had finished the first piece. Romandine then returned the cake plate to the restaurant and drove Dunn home. According to Dunn, Romandine later told him that "it took 79 cents, or a small lighter, and a napkin." Dunn also

said that Romandine had advised him that if the police questioned him he should act calm and not twiddle his hands or fidget.

For four days, the jury heard testimony from the government's witnesses, including Agent Vergon, Shah, Miller, the 911 dispatcher, a police officer, ten firefighters, representatives from each of the companies owed money by the Romandines, a forensic auditor, three representatives from the insurance company, a lineman for the electric company, an engineer from the natural-gas company, and the owner of the damaged building. Their testimony, which for the most part was unchallenged, established Romandine's financial situation, the cause of the fire, and Romandine's relationship with the insurance company. The more disputed testimony came from Dunn, Ryan, and three former employees of the restaurant, all of whom had given statements to Vergon during his investigation.

Dunn's story at trial differed only slightly from what he had told Agent Vergon during the second interview. He testified that he and Romandine had spent 10 or 15 minutes, not 30, at the restaurant, and that he ate pecan pie, not cake. He also admitted that Jeremy Cowger, a friend of Ryan, was at the restaurant when he left earlier in the evening, although he had not mentioned him to Vergon. And on cross-examination Dunn admitted that he did not disclose the late-night marijuana and pie run until after he had read in the newspaper that there was a reward for information in the case. During that trip to the restaurant, he acknowledged, he didn't go upstairs while he was inside with Romandine, and he didn't know if anyone else was present. He also said that calls from Romandine were not uncommon, and that Romandine had never said anything to him about the business failing.

Ryan Romandine added only that Cowger had also been at the restaurant with him, Dunn, and Schuee on the night of the fire. Ryan testified that he had not mentioned Cowger in prior statements because he had heard a report of a green car being in the area when the fire happened, and Cowger drove a green car. He also said that he did not want Cowger to be hassled or have to go to court, and that he thought Cowger's parents would be upset if they knew he was hanging around Ryan. (Agent Vergon did not interview Cowger, and Cowger was not called as a witness.)

Eldon Haviland, a felon who had been married to Romandine's stepdaughter until their divorce in the mid-nineties, testified that he was hired as a dishwasher in the restaurant in July 2005 but was fired after three weeks. He said that less than a week after he was hired Romandine had offered him $2,500 or $5,000 to burn down the restaurant using a propane torch on the fuse box in the utility room. Haviland, who at the time of trial was serving a 22-month state term for violating his parole, testified that he had spent about

half of his life in prison, and that he had racked up more felony convictions than he could count. He acknowledged that, in exchange for his cooperation, Agent Vergon had offered to check on a pending case for receipt of stolen property. And he admitted that he had told Vergon that he thought Ryan, not Richard, had set the fire. Haviland said he drew this conclusion because after the fire Ryan had told him, "When you want something done right you got to do it yourself."

When the prosecutor elicited Haviland's testimony about Romandine's offer to burn down the restaurant, he also asked Haviland whether he and Romandine were using drugs when Romandine made the offer, and Haviland responded that they were. The prosecutor then asked what drugs they were using, and Haviland answered that he was using crystal methamphetamine and Romandine was smoking a joint. Romandine did not object to the testimony about drug use when it was elicited, and the record is silent as to whether he contested its admissibility beforehand.

Chapin Manning, who was 18 or 19 years old at the time of the fire, testified that he had worked at the restaurant as a cook but was no longer employed there when it burned down. Manning, who said he was aware that a reward had been offered for information about the arson, related a conversation he had with Romandine in the restaurant's pool room 6 to 10 weeks before the fire. He testified that Romandine had said, "Sometimes I just wish this place would burn down," that he responded, jokingly, "Well, how much you offering?" and that Romandine gave a price. Manning said he countered with a higher figure, and then the conversation ended. The following week, Manning continued, he asked Romandine if he had been kidding and Romandine answered that he was "just messing around." On cross-examination, Romandine's attorney confronted Manning with his prior statements, where at various times he had said that the conversation occurred in the restaurant kitchen, that Romandine had offered $5,000, that Romandine had offered $7,000, that he had counter-offered $10,000, that he had counter-offered $7,000, and that there had been only a single conversation which ended with Romandine saying, "I was just kidding anyway." Manning also testified that, before the fire, he had mentioned the conversation to his roommate, Chris Friebergs.

Friebergs, also 18 or 19 at the time of the fire, testified that he had worked at the restaurant until he was fired in October of that year. Friebergs testified that Romandine had told him the insurance policy would pay $100,000 if the restaurant burned down, and that Romandine had suggested that Friebergs leave on a fryer, heat lamp, or oven. Friebergs initially testified that this conversation had taken place the previous August or earlier, but later in his testimony he said that the conversation had occurred shortly before the mid-November fire. Friebergs, however, did not mention during his direct examination that Romandine had offered him $5,000 to burn down the restaurant, though he had made that

claim to Agent Vergon. On cross-examination, Friebergs also admitted that he had not said anything about the insurance policy to Vergon or the grand jury. And he admitted that he lied when he told the grand jury that he had quit his job because there was not enough work, when in fact he had been fired.

Finally, the government called Diane Mackey, Romandine's sister-in-law and the manager of the restaurant at the time of the fire. Mackey testified that Ryan had asked her to leave a little early that night. She had noticed that some clothing had been removed from the restaurant before the fire, but she admitted that she had not seen Romandine remove the items and was not even sure they were his. Mackey also admitted that she had a prior felony conviction for possessing methamphetamine, that her son was in jail, and that the assistant United States attorney had said he would tell the state prosecutor overseeing her son's case about her cooperation.

Romandine called three witnesses: Misha, his wife; Melissa Welsh, his niece; and Kevin Steele, his niece's boyfriend. Misha testified that business had slowed prior to the fire but slow periods in the fall were not unusual and business typically picked up around the holidays. She testified that she had not been worried about the business, and that the restaurant already had a lot of holiday parties booked. She also testified that she and Romandine had lost personal items in the fire, including a brand new (but apparently broken) TV, a CD player, her mother's cookbooks and handwritten recipes, her kids' birth certificates "with their little feet prints," and her shoes and their clothing. Misha testified that she and Romandine kept clothes to change into at the restaurant, and that she would take them home each weekend to wash. She testified that she did not observe Romandine removing any of their personal items on the weekend before the fire. Finally, she testified that Romandine's green Cadillac was parked at his sister Renee's house from around her birthday, September 23, until the end of that year.

Welsh, Renee's daughter, testified that on the night of the fire Romandine's Cadillac was parked at the house she shared with her mother. She said that the car was present when she went to sleep and when she woke up the next day, and that it was blocked in by three other vehicles. Steele testified that he lived with Welsh and Renee at the time of the fire and that the Cadillac was parked there that night.

In the middle of the trial, the government asked the district court if Manning and Friebergs could testify about their use of drugs with Romandine. The prosecutor explained that these two witnesses had not told him about using drugs with Romandine until the night before, and he argued that the tardy request for admission should be excused because Haviland already had testified that he used drugs with Romandine and Romandine knew

the government intended to offer testimony from Dunn that he smoked marijuana with him on the night of the fire.

The prosecutor argued that the drug-use testimony was "inextricably intertwined" evidence of the arson because it purportedly established "a much closer relationship than mere employer-employee" and showed that Manning and Friebergs "were close associates of the defendant with whom he felt able to entrust this request." According to the prosecutor, "the fact that they are meeting outside of work, so to speak, and doing these things would tend to indicate that." Romandine objected, arguing that the testimony was offered to show his propensity to commit crime, in violation of Rule 404(b), and that it added little to the government's case but was highly prejudicial. The court allowed the testimony, concluding that it was "not being offered to show anything other than the relationship between this defendant and these individuals."

When the government elicited testimony about Manning's use of marijuana with Romandine, Manning had previously testified that they had a friendly relationship and would socialize after work. Similarly, when the government elicited Friebergs's testimony about using drugs (marijuana and methamphetamines) with Romandine, Friebergs had already testified that he and Romandine were friends and would spend time together outside of work. With regard to Dunn, in addition to eliciting that Dunn and Romandine were friends and had smoked marijuana together on the night of the fire, the government also inquired into the extent of Dunn's past drug use with Romandine and that Romandine sometimes paid Dunn in marijuana for his work at the restaurant.

> After closing arguments, the jury was given the following instruction:
> You have heard evidence of certain acts of the defendant other than those acts charged in the indictment. The defendant is not on trial for any act or conduct not alleged in the indictment. Therefore, you may consider evidence of acts and conduct not alleged in the indictment for these limited purposes: motive, intent, opportunity, preparation, plan, knowledge, absence of mistake or accident, identity, and in deciding whether the defendant's testimony is truthful in whole, in part, or not at all.

Romandine did not testify. The jury returned a guilty verdict. The district court sentenced Romandine to 96 months' imprisonment followed by three years' supervised release, and ordered him to pay $264,763 in restitution.

## II. Discussion

Romandine challenges only the admission of testimony about his prior drug use with Manning, Friebergs, and Dunn. The government responds that their testimony—and

Haviland's—was properly admitted as "intricately related" evidence. According to the government, the evidence shows the closeness of Romandine's relationship with his employees and explains why Romandine was comfortable discussing with them his desire to burn down the restaurant.

### A. Rule 404(b) and "Intricately Related" Evidence

We review evidentiary rulings for an abuse of discretion. *United States v. Brown*, 250 F.3d 580, 584 (7th Cir. 2001). Rule 404(b) generally prohibits the admission of evidence of a defendant's uncharged bad acts because such evidence tends to be particularly inflammatory. *See United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006). Under the rule, however, evidence of bad acts may be admissible "for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." FED. R. EVID. 404(b). We also have said that evidence of other bad acts is admissible when it is "intricately related" (or "inextricably intertwined") with the charged offense, meaning that the evidence is necessary to complete the story of the crime, its absence would create a chronological or conceptual void in the narrative of the charged crime, or the evidence "is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of the charged crime." *United States v. Simpson*, 479 F.3d 492, 500-01 (7th Cir. 2007); *see also United States v. Griffin*, 493 F.3d 856, 867 (7th Cir. 2007); *United States v. Gougis*, 432 F.3d 735, 742 (7th Cir. 2005).

The utility of the "intricately related" formula was questioned in our recent decision in *United States v. Taylor*, 522 F.3d 731 (7th Cir. 2008). In any event, the "intricately related" rationale is inapplicable here. Evidence that Romandine had, in the past, used drugs with Manning, Friebergs and Dunn was not directly connected to the narrative of the charged crime. While it did add some additional detail to the jury's view of Romandine's relationship to his employees, that relationship was not in dispute. Hence, the government's reliance on our decisions upholding the admission of evidence as "inextricably intertwined" to a charged conspiracy when it tended to prove a preexisting relationship among coconspirators is misplaced. *See*, *e.g.*, *United States v. Luster*, 480 F.3d 551, 556-57 (7th Cir. 2007) (evidence showed operational structure of conspiracy); *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006) (evidence explained genesis of relationship between coconspirators); *Gougis*, 432 F.3d at 742-43 (evidence established relationship of trust among coconspirators).

The government's contention that the jury would have been confused had it not been informed that Romandine used drugs with his employees lacks support. Certainly the district court may admit evidence necessary to make the government's case more understandable— for example, to explain code language in a drug case, *see, e.g., United*

*States v. Harris*, 271 F.3d 690, 705 (7th Cir. 2001)—but bad-acts evidence should not be admitted to bootstrap the government's theory of it's case. *See Simpson*, 479 F.3d at 500; 1 McCORMICK ON EVIDENCE § 190 (6th ed. 2006) (cited in *Simpson)* (cautioning that "[t]his rationale should be applied only when reference to the other crimes is essential to a coherent and intelligible description of the offense at bar"); *United States v. Paladino*, 401 F.3d 471, 475 (7th Cir. 2005) (noting that purpose of exception is to "enable the jurors to make sense of the evidence . . . and to avoid puzzling them by making them think that facts important to their understanding of the case are being concealed"). Here the absence of the challenged testimony would not have created a conceptual void. *See Simpson*, 479 F.3d at 500. The jurors knew that Romandine was friendly with Manning, Friebergs, and Dunn, and that he socialized with them outside of work. It appears that had they not heard the inadmissible testimony, "it would not have occurred to them that they were missing anything." *See Paladino*, 401 F.3d at 475.

### B. Rule 403

Additionally, the testimony regarding Romandine's past drug use should have been inadmissible if its probative value in this arson trial did not substantially outweigh the risk of unfair prejudice. FED. R. EVID. 403. Such evidence should be excluded under Rule 403 if its probative value is "insignificant compared to its inflammatory nature." *Gougis*, 432 F.3d at 743 (internal citation and quotation marks omitted).

Admittedly, Romandine's prior drug use with his employees has some probative value in showing his comfort with and closeness to Manning, Friebergs, and Dunn (the evidentiary purpose the government articulated). But the jury already was aware that 46-year-old Romandine was friendly with his then-teenaged employees and socialized with them outside of work. Moreover, by asking the witnesses to name the drugs they used with Romandine, the prosecutor appears to have overly underscored the drug environment surrounding this case.

The government advances that the district court's limiting instruction at the end of trial eliminated any prejudice to Romandine. And, indeed, we have said that limiting instructions can minimize the prejudicial effect of bad-acts evidence. *See United States v. Strong*, 485 F.3d 985, 991 (7th Cir. 2007); *United States v. Whitlow*, 381 F.3d 679, 686 (7th Cir. 2004); *United States v. Rollins*, 301 F.3d 511, 520 (7th Cir. 2002); *but see United States v. Jones*, 455 F.3d 800, 811 (7th Cir. 2006) (Easterbrook, J., concurring) (questioning value of limiting instructions for bad-acts evidence). However, the instruction given by the court authorized the jury to use the evidence of Romandine's other bad acts for any of the purposes explicitly authorized by Rule 404(b) (even though the evidence was not offered for any of those purposes), as well as "in deciding whether the defendant's testimony is truthful in whole, in

part, or not at all"—an inapplicable proposition since Romandine did not testify. *Cf.* Pattern Criminal Federal Jury Instructions for the Seventh Circuit § 3.04 & comment (1998) (making no mention of "impeachment" among the proper bases for admitting bad-acts evidence). As we stated in a case where it was the defendants who argued that they should have been allowed to impeach a government witness with evidence of past drug and alcohol abuse, "[i]t is improper to impeach a witness by presenting evidence that he has engaged in criminal or otherwise illegal or socially reprobated behavior unless the evidence undermines the credibility of his testimony beyond whatever undermining would be accomplished just by besmirching the witness's character." *United States v. Spano*, 421 F.3d 599, 606 (7th Cir. 2005). As we noted then, drug use is fodder for impeachment only if the witness is under the influence of drugs when testifying or if there is reason to believe that drugs "had seriously impaired his memory or had prevented him from understanding the events about which he testified when they took place." *Id.* In any event, because Romandine did not testify, the instruction spoke to a non-existent factual situation and potentially minimized its effect of eliminating prejudice.

Notwithstanding the above analysis of the trial testimony, as in any case where evidence is erroneously admitted, we must address whether reversal is the appropriate remedy. The error of admissibility in this case may be considered harmless if it is clear beyond a reasonable doubt that a rational jury would have convicted Romandine of arson without the improper evidence. *See Brown*, 250 F.3d at 586. It is the government's burden to show that such error was harmless. *United States v. Harbin*, 250 F.3d 532, 542 (7th Cir. 2001).

We conclude that the government has carried that burden. While recognizing that there were some inconsistencies within the various employees' testimony, the constant and dominant theme of that testimony was undisputed: Romandine wanted to burn down his restaurant. His debts were piling up and he had incurred over $3,000 in bank fees for bounced checks, but another bankruptcy filing was not an option. And yet he always made sure to deposit the cash necessary for his insurance payments. Technically only Ryan, the named policyholder, stood to gain from the restaurant's insurance policy, but we know that Ryan was home when the fire started because he was wearing a monitoring bracelet. And though Romandine's attorney suggested in his cross-examinations that Cowger may have been involved, it is unclear what his motive would have been. Meanwhile, Dunn's trial testimony, which was consistent with his second interview with Agent Vergon, placed Romandine at the restaurant at the time the fire started—contrary to Romandine's own account that he had not been at the restaurant that night—and, importantly, was corroborated by cellphone records. While Dunn did not check to see if anyone else was in the restaurant, Vergon found no sign of a forced entry. And though Romandine's family members testified that they saw Romandine's car blocked into their driveway the night before and the morning after the fire, they could not rule out the possibility that Romandine

took the car out that night.  Finally, Dunn's statement that Romandine had said "it took 79 cents, or a small lighter, and a napkin" was corroborated by Vergon's own conclusion that the fire began by open-flame ignition in a utility room used to store paper items.

Clearly, the significant amount of untainted evidence in this case is sufficient to compel the conclusion that a rational jury could find Romandine guilty beyond a reasonable doubt, notwithstanding the erroneously admitted evidence.

AFFIRMED.